1  VICKI I. PODBERESKY (SBN 123220)
   vpod@aplaw.law
2  ANDRUES/PODBERESKY
   818 West 7th Street, Suite 960
3  Los Angeles, CA 90017
   Telephone:   (213) 395-0400
4  Facsimile:    (213) 395-0401

5  Glen T. Jonas (SBN 166038)
   glenjonas@aol.com
6  JONAS AND DRISCOLL LLP
   1108 Sartori Avenue, Suite 320
7  Torrance, CA 90501
   Telephone: (213) 683-2033
8  Facsimile: (310) 218-4983

9
   Attorneys for Defendant
10 Peter Tripp Akemann

11              UNITED STATES DISTRICT COURT

12              CENTRAL DISTRICT OF CALIFORNIA

13

14 UNITED STATES OF AMERICA,        Case No. 25 CR 00074 MWF

15              Plaintiff,          DEFENDANT'S REDACTED
                                    SENTENCING MEMORANDUM
16        vs.
                                    DATE:      September 15, 2025
17 PETER AKEMANN,                   TIME:      2:30 p.m.
                                    CTRM:      Courtroom of the
18              Defendant.                     Hon. Michael W. Fitzgerald

19

20

21

22

23

24

25

26

27

28

# **TABLE OF CONTENTS**

I.     INTRODUCTION ........................................................................................... 1

II.    FACTUAL BACKGROUND ......................................................................... 1

    A.    Childhood ............................................................................................ 1

    B.    College Years ...................................................................................... 2

    C.    Building a Life Together; Building a Life of Giving ............................. 3

    D.    Character and Acceptance of Responsibility ..................................... 7

    E.    Family Struggles……………………………………………………… .14

III.   SENTENCING GUIDELINES ..................................................................... 16

IV.    A PROBATIONARY SENTENCE IS APPROPRIATE IN THIS CASE ........ 16

    A.    Factors In Support of Probation ........................................................ 17

        1.    Character and Remorse ......................................................... 17

        2.    Respect for the Law and Need for Deterrence ....................... 17

        3.    Family Circumstances ........................................................... 19

V.     CONCLUSION ........................................................................................... 20

# **TABLE OF AUTHORITIES**

## **CASES**

*United States v. Gall*, 552 U.S. 28 (2007) .................................................................16

*United States v. Gupta*, 904 F. Supp. 2d 349 (2012) .................................................20

*United States v. Knights*, 534 U.S. 112 (2001) .........................................................16

*United States v. Ruff,* 535 F.3d 999 (9th Cir. 2008) ..................................................17

## **STATUTES**

18 U.S.C § 3553 .........................................................................................................16

## **OTHER AUTHORITIES**

U.S.S.G. § 5F1.1 .........................................................................................................16

U.S.S.G. § 5F1.2 .........................................................................................................16

U.S.S.G. § 5F1.3 .........................................................................................................16

U.S.S.G. § 5F1.5 .........................................................................................................16

## MEMORANDUM OF POINTS AND AUTHORITIES

## I.    INTRODUCTION

Mr. Akemann finds himself before this Court not because of greed, or malice or bad intentions; his fault in this case is a single decision of sheer stupidity when he made the decision to launch a recreational drone and fly it towards a fire-endangered area to see if a friend's home had been burned. In doing so, he lost visual sight of the drone and foolishly counted on the technology of the drone's geofencing to keep him from entering airspace that was critical to the fire suppression efforts in Los Angeles on January 9, 2025.  This reckless and thoughtless act resulted in him damaging a water carrier flying in the Santa Monica area. For all of this he is immensely remorseful. This momentary but significant lapse in judgement has led him to this moment where he stands before this Court convicted of a crime and having accepted full responsibility for his actions. *See* Exhibit A, attached hereto, Letter of Acceptance of Responsibility; Exhibit B, attached hereto, Video-taped public apology at St. John's Presbyterian Church[1] and transcript. The defense asks this Court to adopt the recommendations of U.S. Probation and impose a sentence of straight probation. Such a sentence is warranted when viewed in the context of the entirety of Mr. Akemann's life; a life led with compassion, generosity and support for his family, friends and members of the community.

## II.    FACTUAL BACKGROUND

### A.    Childhood

Peter Akemann is the oldest of three biological children of Charles and Patricia Akemann. Peter was born and raised in Goleta, California. Peter's father, Charles Akemann was a distinguished professor of mathematics at the University of California, Santa Barbara, since 1969. His mother, Patricia Ross Akemann, who has a

---

[1] https://www.youtube.com/watch?v=oI9bEgL3acs [relevant portion at 22:50]

background in Psychology, raised Peter and his siblings and later worked as a nurse and counselor. His parents hail from Illinois and Wisconsin and he has many happy memories of family vacations at his grandparents' cottage on Lake Geneva in Wisconsin. He describes his early childhood as stable, and his parents as thrifty, providing for the family's basic needs.  As a young child he describes feeling "goofy" and the kid who other kids would pick on. For Peter, things changed when his parents presented him in 1981 with his own computer. At 13 years of age, and a self-described "nerd," the world of computer programming opened up to Peter. He found like-minded friends who also were enthusiastic programmers and for whom programming was a passion. As a self-taught programmer, Peter obtained his first programming job at the age of 16, writing software for a company.

As a child, Peter was not raised with any formal religion in the family home. His parents are areligious and as such Peter grew up with no ties to any religious organization. In junior high school, Peter recalls making the decision to become an atheist. He and a close friend of the Christian faith would constantly debate about the existence of God, religious philosophy and metaphysics. This debate went on for years and by the time Peter started college, he had been convinced through these lively debates of the moral strength and answers religion could provide in his life. As he describes it,

> I had this moment of conversion to Christianity. God had given me strength to get over the metaphysical hump that was holding me back all these years. From that point on Christianity has been the underpinning of my life.

### B.    College Years

At 19 years old, Peter was out of the family home and attending school at the University of California, San Diego. Around this same time, his parents decided to adopt his two youngest siblings, Shannon and Deborah. Shannon and Deborah were adopted by the Akemanns at birth in 1987. A few years later the Akemanns learned

that both of their adopted daughters suffered from extreme hearing loss. The stress of now having to care for two hearing impaired children had an enormous impact on hos parents' lives and of the family more broadly.

At college, Peter was experiencing some of his own personal limitations. While a smart and intelligent high school student, Peter admittedly lacked discipline. As a result, he failed to make the requisite grade point average to be admitted into the Computer Science major – a dream he had since entering college.  He quickly understood that he needed to become more serious about his studies and enrolled in Mathematics as his major. He continued to work summers in programming and found a job at a computer gaming company. In 1990 he graduated from UCSD with a degree in Mathematics and went on to get a PhD in Mathematics at UC Berkeley. While at Berkeley, Peter and a friend, Dogan Koslu, started to develop an idea for a 3D computer game. Peter began splitting his time between working on his PhD and developing the game. A successful publisher pitch led to the formation of Treyarch Invention, LLC in 1996 and the creation of one of the first 3D video games "Die by the Sword", which was released in 1998, shortly after Peter earned his PhD. Mr. Akemann left academia and began a successful career in the computer gaming industry. He is credited as a computer gaming visionary and gained significant public recognition with the formation of Treyarch. Peter and his partner grew Treyarch from a small studio into a key global contributor in gaming. In 2001 Treyarch was sold to Activision in 2001 and became part of Activision's global gaming empire, with such titles as Spider-Man and Spider-Man 2. Treyarch would go on to lead the celebrated *Call of Duty* franchise. Peter's time with Activision ended after three years, leading to a hiatus from game development.

### C.    Building a Life Together; Building a Life of Giving

Notwithstanding his success and achievements in game development, Peter Akemann has led a very low-profile life in which kindness, generosity and faith have been his guiding principles. Peter met his wife Claudia in 1999 on an online Christian

1  dating service. Claudia was a student at Cal State Long Beach studying graphic art
2  design. Peter was working long hours building Treyarch into a leading game
3  developer. According to Peter, after one of his long days at work he came home at
4  3:00 am and went on the dating website. Serendipity led to Peter and Claudia finding
5  each other in those early morning hours. They agreed to meet in person and, as Peter
6  says, "everything went from there."

7        By 2000 they were married, beginning their life together in a one-bedroom
8  apartment in Westchester with hopes of starting a family together as soon as possible.
9  Life, however, did not cooperate. The couple was unable to conceive a child and as
10 Peter recalls:

11        It was five dark years as we tried and failed to have kids.
12        Having a family was something we both desperately wanted.
13        Unless you have experienced this type of disappointment
14        and frustration, it is hard to understand how devastating this
15        is.

16        It was during this time that Peter and Claudia had come into a considerable sum
17 of money from the sale of Peter's company. Together they started the Merenderos
18 Foundation, a charitable organization they self-funded with a mission to feed children
19 in poverty in Argentina and Uruguay. Claudia Akemann, Peter's wife writes:

20        In 2001, during a severe economic crisis in Uruguay, a
21        planned family celebration fell through after Peter shattered
22        his ankle and we couldn't travel there. We used the party
23        money to buy bread and milk for hungry children instead.
24        What was meant to last a month became years. With my
25        brother-in-law in Uruguay organizing parents to cook and
26        clean, we set up a simple kitchen that served 200-300
27        children daily, with minimal overhead.
28 *See* Exhibit C, attached hereto, Letters of Support, Letter of Claudia

1   Akemann.

2       Over the years Claudia estimates that she and Peter contributed roughly

3   $250,000 over a seven-year period to fund their charitable organization. Hundreds of

4   children in poverty received daily meals from the foundation, which was eventually

5   handed off to local city governments to take over and run. Being able to help children

6   in need, also helped the Akemanns through this very dark period in their lives.

7       Wendy Appleby, a close friend of Peter's since college days, writes:

8           Over the years, Peter has demonstrated his huge heart in so

9           many ways both in everyday kindness and in incredibly

10           generous gestures. Early in his marriage, he and his wife

11           discovered that there were children going hungry in his

12           wife's home country of Uruguay, and they quietly invested

13           their own funds and a ton of energy, love, and time into

14           creating and running an organization that brought fresh milk

15           and other sources of nutrition to those children daily.

16   *See* Exhibit C, Letter of Wendy Appleby.

17       In 2005, through the miracle of IVF, the Akemanns were able to conceive their

18   first daughter Kaley Simone. The Akemanns were then blessed with three more

19   daughters in quick succession – Robin Emily (born in 2007), Megan Claire (born in

20   2008) and Hazel Raquel (born in 2010) – all within the span of three years, and all

21   naturally conceived. As Peter says,

22           We always wanted a family with children close in age so we

23           could experience life together. I have been so lucky. So

24           many fortunate things have happened to me. I am thankful

25           for my four beautiful daughters, and I have so much

26           gratitude towards my wife who has made such a wonderful

27           family life for all of us.

28       The appreciation and love Peter has for his wife and children is apparent to all

**DEFENDANT'S SENTENCING MEMORANDUM**

who know him. Kelly Akemann, Peter's sister, observes:

> As a father, Peter is devoted and selfless. His four daughters
> are his top priority, and he works tirelessly to provide them
> with a safe, stable, and loving home. While he has achieved
> much professionally, I believe his greatest accomplishment
> has been raising children who are compassionate, intelligent,
> and well adjusted.

*Id.,* Letter of Kelly Akemann.

Sam Wambaa, a friend and fellow parishioner, states:

> Peter is the devoted father of four daughters whom he has
> raised with unwavering love and purpose. His parenting is
> marked not just by presence, but by intention. He pours his
> soul into nurturing them, instilling them with values that
> anchor them in a chaotic world. I have watched him sacrifice
> his own comfort time and again to ensure their stability,
> education and happiness.

*Id.,* Letter of Sam Wambaa.

Beyond starting a charitable organization, the Akemanns have spread their own good fortune throughout their community. After the sale of his company, Peter tithed 10% of the profits from the sale to his prior church, which was used to set up a scholarship fund. Friends and family alike have been recipients of Peter's kindness and generosity. He has provided money to numerous people to help them in various ways. As Peter says:

> We have helped friends and family buy their first home and
> we have helped people in our community who are
> experiencing financial hardships make ends meet. Claudia
> and I have a policy, we do not give money with strings
> attached or questions asked. We do not loan money, we give

money. If someone needs help, we want to help them. We
are not here to judge anyone. We give blindly with the
intention of supporting the people in our lives and in our
community, and we never look back.

By 2007 Peter was back in the computer game development world and co-founded Workshop Entertainment, Inc. with Chris Busse and Charles Tolman. The team developed several highly successful games, and Workshop was eventually acquired by Skydance Media in 2016 and used to launch a new interactive division for Skydance, Skydance Interactive LLC, where Peter served as President and Chief Technology Officer. Since the beginning of 2025, Mr. Akemann has been employed with a start-up entertainment and video game company as its Executive Director of Technology.

### D.     Character and Acceptance of Responsibility

The most telling example of Peter Akemann's strong moral character is demonstrated through his early, sincere and complete acceptance of responsibility for his conduct. Peter entered into a plea agreement on January 31, 2025, shortly after a search warrant was executed at his home. He appeared before this Court to enter a guilty plea on February 12, 2025. Even before he entered his formal plea of guilty, Peter made a very public apology. On February 2, 2025, during a recorded service at St. John's Presbyterian, Peter Akemann professed his guilt and remorse to his congregation, and his apologies to all those he had harmed through his conduct. Because "a picture speaks a thousand words," counsel will not attempt to describe to this Court how profoundly grief-ridden and remorseful Mr. Akemann is. The expression and sincerity of his remorse can best be gauged by this Court through the video clip of his statement, and these words:

. . . I pled guilty to a federal charge of interfering with an
aircraft. And it's a fair -- fair charge; I did it. It was
reckless, and it was foolish. You know, I thought I was

following the rules. I was trying to do it carefully and right. But obviously I made many mistakes. Including just the grand mistake of what a failure in judgment to be there in the first place. I am filled with grief at the pain and damage that I've caused for people. I wish that I could speak with each of the people individually who are very justifiably angry with me. And apologize and express that to them. I know that's impossible.

I don't know what's going to come next for me, but it's going to be a long dark road. I have been beyond grateful for the undeserved grace that a number of you have expressed for me, and love for me and for my family. I feel grateful for my family as they bear a lot of the consequence of this even though they're not to blame.

So I would just thank you for your prayers and of God's grace and strength for me to bear what is coming honorably and to make amends where I can. Where that's even possible.

*See* Exhibit B, Copy of YouTube video posted by St. John's Presbyterian Church, February 2, 2025.

The Akemann family have been members of St. John's Presbyterian Church in West Los Angeles for more than 20 years. Peter is an active and devoted member of his church. Reverend Dr. Steven H. Craig writes:

Peter has served many roles at St. John's. He has led small group Bible studies, taught Sunday School, sung in our choir, and- most notably, served as an elder, a position to which he was elected by the congregation and appointed for life. He has carried out his ordination vows with

**DEFENDANT'S SENTENCING MEMORANDUM**

Faithfulness and distinction. . .  I hold Peter in the highest
regard.

I can testify to Peter's honesty, dependability,
thoughtfulness, generosity and strong moral character.

*See* Exhibit C, Letter of Reverand Dr. Steven H. Craig.

Members of Peter's community as well as his business associates also hold him
in the highest regard. People who have known Peter Akemann as a friend, a
congregant and a work colleague have written to this Court, uniformly expressing an
opinion of him as a generous, unselfish, trustworthy and honest person.

Samuel Wambaa describes Peter Akemann as,

. . . more than a friend, he is a brother in faith, a father I
admire, and a cornerstone of our community. He is a man of
integrity, gentleness and resilience. His life has been a living
testament to the quiet strength that comes from love,
devotion and faith. I have seen this not just in moments of
ease, but in times of great trial – when true character reveals
itself. . .

On a personal level, Peter has stood with me through
some of the most painful chapters of my life. . . When my
family lost everything in a house fire, Peter was one of the
first to reach out. He gave without hesitation – his time, his
counsel, and even financial help -- because that's who he is.

His compassion was not performative.

*Id.,* Letter of Samuel Wambaa.

Sheryl Griffin, a retired UCLA employee, has known Peter and his family for
more than fifteen years. Sheryl writes to this Court about the interaction of her
children with the Akemann family, and Peter's caring nature for others:

Peter is a trusted, loving, loyal, generous, and honest person.

**9**

**DEFENDANT'S SENTENCING MEMORANDUM**

He is the first to volunteer at our church and is part of the
church's lay person committees. He has created elaborate
displays and play areas that the schemes of St. John's yearly
summer vacation bible school. He does not get reimbursed
for his time. He does it out of love for others.

*Id.*, Letter of Sheryl Griffin,

Timothy Bernsau, a retired automotive journalist for publications such as Motor
Trend and Street Rodder Magazine, has known Peter for the past 10 years through the
St. John's community. Timothy writes:

Peter is, and has been, heavily involved in various ministries
of St. John's, including administrative committees and in
leadership as an Elder. He devotes hundreds of hours a year
to his volunteer service. His responsibilities include
planning, budgeting, administration, and oversight of
various programs. He also commits many hours to creative
contributions, such as building elaborate sets for holiday
services and for the annual children's bible school.

*Id.*, Letter of Timothy Bernsau.

Maria Isabel Ross met Peter Akemann during the pandemic in a Zoom Bible
Group for St. John's Presbyterian Church. Ms. Ross is a former United States
Probation Officer for the Northern and Central District of California. Ms. Ross and
Mr. Akemann serve as volunteer Ruling Elders for their Church. Through the ties to
their Church, Ms. Ross has come to know Peter Akemann and says this about him:

In the years that I have known Peter, he has shown very
strong moral character as evidenced by his extensive
volunteer work, financial, spiritual, and emotional support of
others, his tremendous long term leadership positions, and
overall caring for our church and local community. . . .

Whether leading bible studies, singing in the choir, donating goods, volunteering his time through different church ministries, including prayer groups, children and adolescent youth groups, vacation bible schools, and helping his daughters with their school events and activities, along with being a full-time working professional, and devoted husband and friend: Peter Akemann remains a highly committed and contributing member of society. . . .

As a former USPO, one of my main duties was to provide the Court federal sentencing recommendations for those individuals that came before the Court. One of the mitigating factors that I was trained to look for and to consider was whether or not a defendant/federal offender had accepted full responsibility for their actions, and if they showed and expressed remorse in their demeanor, and how they related to others during the judicial process. I can tell you without a shadow of a doubt, Your Honor, that Peter Akemann is truly sorry for all the pain, and trouble he has caused to many people that have been affected by this matter. . . .

*Id.*, Letter of Maria Isabel Ross.

Peter continues to serve not only his Church, but he has taken on even more public service in an effort to make amends for his actions. He devotes many Saturdays to working at the Blessed Sacrament Church Food Pantry Ministry. Nancy Stellos, Lead Volunteer and Manager for the Food Pantry has written a letter to this Court documenting Mr. Akemann's service. Ms. Stellos writes:

He has offered his time and good will to the poor and homeless of our community. He also assisted in distributing

clothing, hygiene kits, and other personal items. He has been
a humble volunteer. . .  I wish to acknowledge Peter
Akemann as a great participant in community involvement,
serving the most needy of Hollywood.

*Id.*, Letter of Nancy Stellos, Blessed Sacrament Church Food Pantry Ministry.

Peter's sense of service goes beyond the four walls of his church. Colleagues
from the video game industry have also written to this Court to express their insights
into Peter's character. Yanqi Niu's first fulltime job in the video game industry was as
an associate software engineer at Skydance Interactive where Peter was his direct
manager. Yanqi is an immigrant from China whose dream was to work at one of the
legendary video game studios, like Skydance Interactive. Yanqi writes:

. . .my student visa dictated that if I didn't find a degree-
relevant US job within several months after graduation, I
would simply have to go back to China. And nobody wanted
to hire a foreigner because it takes money to sponsor visa,
and junior level people are often not worth the investment.

Yet Pete hired me simply because he saw something
special in my engineering skill. . . . And when I look back,
without a shred of doubt I can say ***Pete sponsored my
American Dream***- he gave me the opportunity to prove
myself and work for a better life in this industry and this
country. . .

Pete also taught me a lot- that he probably didn't even
realize that. And above them all, was humility. He was never
the kind of "company founder" or "executive" that thought
himself above his employees. If I had a question, he'd rush
out of his office, slightly hunched over, and talk to me at my
desk. If there wasn't an available chair nearby, he'd just

**DEFENDANT'S SENTENCING MEMORANDUM**

1                 kneel on the carpet in his beat-up jeans just so he could talk

2                 to on my eye-level. . .I respectfully ask you to consider

3                 Pete's character, his positive contributions to our industry,

4                 and most importantly, his impact on those around him. Pete

5                 is a genuinely good, humble and honest individual.

6 *Id*., Letter of Yanqi Niu.

7       Peter's longtime friend and business partner Christopher Busse has also written

8 to this Court. Mr. Busse is the co-founder with Peter Akemann of Treyarch Inventions

9 and The Workshop. Based on the over 35 years Mr. Busse has known Peter, he writes:

10                 In the over 35 years that I've known Peter, I think the words

11                 that come to mind most readily about him are honesty,

12                 loyalty, integrity, and upstanding community member. This

13                 is a man that when he sold his first company, Treyarch,

14                 tithed a full 10% of his payout to his church. . . A man who

15                 despite bringing literally hundreds of other families along

16                 for the ride of a successful business, always found ample

17                 time to dedicate to his wife and 4 daughters. . .

18                 When Peter and I started our new venture together in

19                 2007, The Workshop, when times got tough, he was the one

20                 to suggest that he and I put our salaries aside so we could

21                 make sure we could pay our people. . .  I've witnessed him

22                 go deeply out of pocket to help others at the company, at his

23                 church and in the community in general on many occasions.

24                 . . . This is a man who has an easy smile for friends

25                 and strangers alike, with a hearty laugh. A man who has

26                 spent his life building family, community and companies.

27                 He is a curious and inquisitive man, this has helped

28                 him succeed in life and in friendships. It probably was also

**DEFENDANT'S SENTENCING MEMORANDUM**

1      what drove him to be out there that day. But, I can assure

2      you there was no malice or ill-will that spurred him. He and

3      I have spoken since and I can say he is deeply filled with

4      regret, shame and embarrassment, both for himself, but

5      much more for those who know him and do business with

6      that may affected by his poor judgement that day. He will be

7      the first to admit that he made an error that day.

8  *Id.*, Letter of Christopher Busse.

### E.    Family Struggles



**DEFENDANT'S SENTENCING MEMORANDUM**



DEFENDANT'S SENTENCING MEMORANDUM

1

2

3

## III.    SENTENCING GUIDELINES

The Sentencing Guideline calculation for a misdemeanor offense under 18 USC Section 39B is a base offense level of 6, 0-6 months. Additionally, as noted in the PSR Mr. Akemann qualifies for the zero-point offender reduction and has clearly demonstrated acceptance of responsibility resulting in an additional 4 levels off and an offense level of 2. The defense agrees with the calculation by U.S. Probation and concurs for the reasons in the PSR and those set forth below that a sentence of probation for a term of three years and immediate payment of restitution in the amount of $146,765.39 is appropriate.

## IV.    A PROBATIONARY SENTENCE IS APPROPRIATE IN THIS CASE

The Sentencing Guidelines Manual encourages the courts to view "probation [as] a sentence in and of itself," and as "an alternative to incarceration" that may properly account for the Section 3553(a) factors. *See* U.S. Sentencing Guidelines Manual 5, Part B – Probation, Introductory Commentary.  Accordingly, the Guidelines include several non-custodial options, including community confinement (U.S.S.G. § 5F1.1), home detention (U.S.S.G. § 5F1.2), community service (U.S.S.G. § 5F1.3), and occupational restrictions (U.S.S.G. § 5F1.5).  The Supreme Court has made clear that judges are to consider all "the kinds of sentences available" by statute even if the "kinds of sentences…established [by] the guidelines" permit or only encourage prison. *United States v. Gall*, 552 U.S. 28, 59 fn. 11 (2007).

Probation in and of itself is a significant sanction. Probationers are "subject to several standard conditions that substantially restrict their liberty." *Id.* at 48. "Inherent in the very nature of probation is that probationers 'do not enjoy the absolute liberty to which every citizen is entitled.'" *United States v. Knights*, 534 U.S. 112, 119 (2001) (internal citations omitted).   Indeed, probationary sentences are "quite oppressive"

16

**DEFENDANT'S SENTENCING MEMORANDUM**

due to restrictions that accompany them. *United States v. Ruff,* 535 F.3d 999, 1004 (9th Cir. 2008). Here, a sentence of probation as recommended by U.S. Probations is sufficient punishment.

### A.    Factors In Support of Probation

#### 1.    Character and Remorse

As set forth above, and as recognized by Probation, Mr. Akemann has genuine remorse for his conduct. Indeed, as set in the context of his entire life, the decision to fly his drone on January 9, 2025, was a singularly bad decision. There was no intention to cause the result he did. This bad decision stands in stark contrast to the life he has led to date; a life filled with humility and compassion. As some of the people who have written to this Court describe, Mr. Akemann has led by example in his church, his workplace, as a father, a son and a husband. He has helped many people in untold ways and with no expectation of being acknowledged or credited for the help he has offered others. He has given quietly and from his heart, anchored in a strong moral conviction that he has an ethical responsibility to respect and to help others.

#### 2.    Respect for the Law and Need for Deterrence

Mr. Akemann has lived his entire life with respect for the law. His conduct in this case was admittedly reckless, but it was not done with any intent to harm. Just the fact of a conviction, for a person like Mr. Akemann who has no prior arrests or convictions, is personally devastating and publicly shameful.  The personal impact on Mr. Akemann and his family by his conviction has been especially difficult given the high-profile nature and wide-spread media coverage of the incident. The consequences of a federal conviction, whether it be a felony or a misdemeanor, are immediately significant and forever remain a potential impediment to future employment. Mr. Akemann has clearly learned a very hard lesson and paid a significant price for it. There is no doubt that Mr. Akemann will not be in this situation ever again. As his wife notes:

**DEFENDANT'S SENTENCING MEMORANDUM**

1    Peter's conduct in this case was a serious lapse in judgment
2    in an otherwise thoughtful life. He accepts full responsibility
3    for launching the drone, is grateful no one was hurt –
4    especially the pilot and crew – and is sorry for the risk
5    created to firefighters and our community. He was not
6    chasing footage or views; he was trying to check on his
7    workplace and see whether the home of a widow – whose
8    late husband once helped his business — was still standing.
9 *See* Exhibit C, Letter of Claudia Akemann.
10    As for general deterrence, Mr. Akemann's early and quick decision to plead
11 guilty allowed both the Department of Justice and the FBI to send strong and timely
12 messages to the public that flying a drone in a manner which interferes with
13 emergency services, will be prosecuted. His conduct and the early entry of his guilty
14 plea garnered wide coverage by local and national media outlets.  As stated by then
15 Acting United States Attorney Joseph McNally:
16    This damage caused to the Super Scooper is a stark reminder
17    that flying drones during times of emergency poses an
18    extreme threat to personnel trying to help people and
19    compromises the overall ability of police and fire to conduct
20    operations. As this case demonstrates, we will track down
21    drone operators who violate the law and interfere with the
22    critical work of our first responders.
23 And as echoed by Akil Davis, the Assistant Director in Charge of the FBI's Los
24 Angeles Field Office:
25    Lack of common sense and ignorance of your duty as a
26    drone pilot will not shield you from criminal charges.
27    Per GAO, as of 2021, the total drone fleet in the U.S. was estimated to be
28 approximately 2.2 million drones and expected to grow to about 2.7 million in 2026.

**18**
**DEFENDANT'S SENTENCING MEMORANDUM**

1  According to the FAA, only about 1.59 million individuals were certificated or
2  registered with the FAA as pilots. Recreational drones under 250 grams or
3  approximately .5 pounds, such as the one flown by Mr. Akemann, are not required
4  under FAA guidelines to be registered, nor is there any mandatory certification needed
5  before flying.  These drones, readily available on Amazon and other websites for a
6  few hundred dollars, are expected to continue to increase over time. This means that
7  there is a large and growing number of people that operate drones outside the
8  constructs of the FAA.

9       Mr. Akemann's early acceptance of responsibility allowed the government to
10 send a strong deterrent message to this segment of the public. The impact of this type
11 of general deterrence should not be overlooked by the Court.

12              **3.    Family Circumstances**

13      Mr. Akemann is currently faced with significant personal family circumstances
14 that make his presence in the home essential. The defense directs the Court to
15 Paragraphs 65-69 of the PSR. These issues are recurrent and ongoing today. Further,
16 Mr. Akemann's growing responsibilities for his parents as their health continues to
17 deteriorate, require Mr. Akemann's constant availability to assist them as emergencies
18 arise. Moreover, the entire situation has had a detrimental impact on his family. As
19 Claudia notes:

20          This process has had serious consequences for our family.
21          At 6 a.m. when agents executed a home search warrant, our
22          daughters went to school shaken. Peter walked to each
23          neighbor's home on our street to apologize and explain
24          himself. We have reached out to our daughters' counselors
25          and teachers. . . . For a family committed to decent,
26          purposeful living, this has been painful.
27 *See* Exhibit C, Letter of Claudia Akemann.

28

---

**19**
**DEFENDANT'S SENTENCING MEMORANDUM**

## V.   CONCLUSION

As District Judge Jed S. Raycoff noted,

> Imposing a sentence on a fellow human being is a formidable responsibility. It requires a court to consider, with great care and sensitivity, a large complex of facts and factors.

*United States v. Gupta*, (2012 SDNY) 904 F. Supp. 2d 349, 350. The defense asks the Court to consider the circumstances of this offense, the early and fulsome acceptance of responsibility exhibited by Mr. Akemann, his extreme remorse for his conduct, his long history of service to others and his community, and his family circumstances in deciding an appropriate sentence in this case.

For all the reasons stated above, the defense urges this Court to impose a sentence of probation; a sentence sufficient but not greater than necessary to comply with the goals of just punishment.

DATED:  September 2, 2025                    Respectfully submitted,

ANDRUES/PODBERESKY,
A Professional Law Corporation


By:   /s/ Vicki I. Podberesky
      VICKI I PODBERESKY


JONAS AND DRISCOLL LLP

By:   /s/ Glen Jonas
      GLEN JONAS

**DEFENDANT'S SENTENCING MEMORANDUM**